IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LEMKO CORPORATION, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. |
| vs. | ) ) ) ) | FILED: AUG 14, 2008<br>08CV4638<br>JUDGE GRADY |
| METROPOLITAN AREA NETWORKS, INC., a Delaware corporation, | ) ) ) ) ) | MAGISTRATE JUDGE ASHMAN<br>JFB |
| Defendant. | ) | |

**COMPLAINT FOR DECLARARTORY RELIEF AND DAMAGES**

Plaintiff, Lemko Corporation, by its attorneys, John M. Riccione and Paul A. Greenberg of Aronberg Goldgehn Davis & Garmisa, for its Complaint for Declaratory Relief and Damages against Defendant, Metropolitan Area Networks, Inc., states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff, Lemko Corporation ("Lemko" or "Plaintiff"), is an Illinois corporation with its principal place of business located in Schaumburg, Illinois. As such, Lemko is a citizen of the State of Illinois.

2.      Lemko provides the world's only cellular voice and media mesh software-defined network. Lemko's proprietary hardware and software solutions allow it to provide cellular telephony to rural communities throughout the world, especially in areas where cellular services was previously

1

unavailable, and for delivering communication solutions for homeland security, emergency response, and continuity of business and government operations.

3.  Defendant, Metropolitan Area Networks, Inc. ("Defendant" or "MAN"), is a Delaware corporation with its principal place of business in Incline Village, Nevada. MAN purports to provide high-speed business networking solutions. As such, MAN is a citizen of the States of Delaware and Nevada.

4.  This court has diversity jurisdiction over this action pursuant to 28 U.S.C. 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states. Lemko is a citizen of the State of Illinois and MAN is a citizen of the States of Delaware and Nevada.

5.  Venue is proper in this court pursuant to 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this district. The Court has personal jurisdiction over Defendant because, *inter alia,* MAN met with Lemko in Illinois to pursue a business relationship with it, made false representations to Lemko during the parties negotiations in Illinois, entered into and breached a contract with Lemko in Illinois, ordered equipment from Lemko in Illinois, sent a partial payment for the equipment to Lemko in Illinois, committed a tort in Illinois, and caused pecuniary loss to Lemko here.

## BACKGROUND

6. In early March 2008, MAN's chief technology officer, Doug Greenwood ("Greenwood"), and Pete Fiorey ("Fiorey"), a MAN consultant, met with Lemko representatives at its offices in Schaumburg to explore a possible business relationship between the parties.

7. In an effort to secure an initial meeting with Lemko, Danny Stroud ("Stroud") a MAN constultant and Fiorey represented that MAN had an opportunity to provide cellular telephony for a mining company located in Canada. To this end, Stroud and Fiorey indicated that MAN would like to form a relationship with Lemko which would enable MAN to use Lemko's proprietary hardware and software. In order to make an informed decision as to the feasibility of such a project, Lemko requested additional information from MAN.

8. MAN refused to furnish any additional information unless and until Lemko executed a mutual non-disclosure agreement (the "NDA"). But Lemko refused to sign the NDA unless and until it knew that MAN's proposed venture was feasible.

9. In order to induce Lemko to sign the NDA, MAN represented to Lemko that it had a contractual relationship with Rogers Wireless Partnership ("Rogers"), which enabled MAN to use Rogers' licensed cellular spectrum. Rogers is Canada's largest wireless communications service provider, serving more than 5.7 million subscribers as of December 31, 2004, including over 5.5 million wireless voice and data subscribers and nearly 0.2 million one-way messaging (paging) subscribers.

10.     Stroud and Fiorey represented that Rogers had given MAN permission to use its Rogers' cellular spectrum to conduct a trial in a remote mining area. They further represented that if the trial succeeded, then Rogers was obligated to grant MAN the right to use Rogers' spectrum to deploy Lemko technology in over 2000 mining and oil sites located throughout Canada.

11.     MAN's representations regarding the nature of its relationship with Rogers was the lynchpin of Lemko's decision to sign the NDA. If Lemko could not use Rogers' cellular spectrum, then its technology would not work.

12.     Based on MAN's representations, Lemko signed the NDA (Ex. 1, the NDA) and further agreed to sell MAN the necessary hardware, software, and consulting services (the "Equipment and Services") to conduct the proposed trial and, if successful, to furnish all the necessary Equipment and Services for over 2000 Canadian oil and mining companies (the "Contract").

13.     On May 16, 2008, MAN issued a verbal purchase order and made a pre-payment to Lemko in the amount of $23,500.00 against an invoice in the amount of $98,500.00. Lemko caused the Equipment to be delivered to the Canadian mining company on or after May 19, 2008. On June 25, 2008, Lemko invoiced (the "Invoice") MAN for the Equipment and Services in the total amount of $75,500.00. (Ex. 2, the Invoice.) To date, MAN has failed to pay Lemko the $75,000.00.

14.     As it turned out, MAN's representations concerning its relationship with Rogers were completely false. MAN's relationship was actually with CWI Communications, Inc. ("CWI"), one of Rogers' largest distributors. MAN had

been coordinating all of its activities with CWI, which, in turn, was dealing directly with Rogers. Worse, MAN's relationship with CWI was precarious at best. Weeks before the trial was scheduled to commence, MAN sent a letter to CWI terminating its relationship.

15.  On July 22, 2008, Rogers terminated its relationship with CWI, thus ending any hopes of Lemko to perform its obligations and reap the benefits under the Contract and install its technology in the Canadian mining and oil companies.

16.  Lemko has had a relationship with Rogers which predated Lemko's relationship with MAN.

## Count I

## Damages for Breach of Contract

17.  Lemko repeats and realleges its allegations contained in Paragraphs 1 through 16 above as if fully set forth herein.

18.  MAN breached the Contract with Lemko in failing and refusing to pay for the Equipment and Services, and honor its obligations under the Contract.

19.  Lemko performed all conditions precedent under the Contract.

20.  Lemko has been damaged by MAN failure and refusal to pay for the Equipment and Services in the sum of $75,000, as well as the time and effort expended by Lemko in furtherance of the Contract.  In addition, Lemko was prevented from realizing the benefits under the Contract and the expected

profits from being able to install its technology in the Canadian mining and oil companies through its relationship with MAN as purported by MAN.

**WHEREFORE**, Plaintiff, Lemko Corporation, respectfully requests that this Honorable Court grant judgment in its favor for such amount as this Court deems just and reasonable under the circumstances.

## Count II

### Rescission for Total Breach of Contract

21. Lemko repeats and realleges its allegations contained in Paragraphs 1 through 16 above as if fully set forth herein.

22. MAN breached the Contract with Lemko in total as it failed and refused to honor any of its obligations thereunder and, upon information and belief, did not intend to honor its obligations when it signed the same.

23. MAN breached the Contract with Lemko in failing and refusing to honor any obligation thereunder.

24. Lemko performed all conditions precedent under the Contract.

25. Lemko has been damaged by MAN's total and utter failure and refusal to honor any obligation under the Contract.

**WHEREFORE**, Plaintiff, Lemko Corporation, respectfully requests that this Honorable Court grant judgment in its favor and against MAN and order the Contract rescinded, and otherwise null and void, and grant such other and further relief as this Court deems just and reasonable under the circumstances.

## COUNT III

### DECLARATORY RELIEF PURSUANT TO 28 U.S.C.A. 2201

26. Plaintiff repeats and realleges and incorporates Paragraphs 1 through 16 as if fully set forth herein.

27. Due to MAN's utter and total breach of the Contract, including the NDA, and its fraud in the inducement of Lemko in signing the NDA, this Court should declare the Contract, including the NDA, null and void and of no value.

28. Lemko's right to do business with Rogers is in jeopardy as a result of MAN's fraudulent inducement to enter into the NDA, while knowing that MAN did not have a real relationship with Rogers at the time.

29. Under these facts, an actual controversy now exists between Lemko and MAN relating to the parties' obligations under the NDA *vis-a vis* Rogers.

**WHEREFORE**, Plaintiff, Lemko Corporation, respectfully requests that the Court enter declaratory judgment in its favor and against Defendant, MAN, as follows:

(a) Declaring the respective rights and duties of Lemko and MAN regarding the Contract, including the NDA;

(b) Declaring that Lemko is not bound by the NDA, including but not limited to the provisions therein relating to "Non-Circumvention;"

(c) Awarding Lemko its costs, expenses and attorney's fees incurred herein; and

(d) Granting such other and further relief as the Court deems just and proper.

## Count IV

### Damages for Fraud in the Inducement

26. Plaintiff repeats and realleges and incorporates Paragraphs 1 through 16 as if fully set forth herein.

27. In or about March of 2008, Stroud and Fiorey of MAN represented to Lemko that it had a contractual relationship with Rogers, which enabled MAN to use Rogers' licensed cellular spectrum; that Rogers had given MAN permission to conduct a trial for Rogers' cellular spectrum in a remote mining area in Canada; and that if the trial was successful, then Rogers was obligated to grant MAN the right to use Rogers' spectrum to deploy Lemko's technology in over 2000 mining and oil sites in Canada.

28. Stroud's, Fiorey's and MAN's representations were material to the Contract and the NDA as they were important to Lemko in deciding to enter into a relationship with MAN.

29. At the time the representations were made by Stroud, Fiorey and MAN, they knew they were false. However, MAN intended that Lemko rely upon the representations in entering into the Contract and NDA and to expend the effort in gearing up for the trial and eventual business relationship which was anticipated.

30. Lemko did rely upon the representations made by Stroud, Ficrey and MAN in agreeing to sign the Contract and NDA and expending effort and

expenses gearing up for the trial and eventual business relationship which was anticipated.

31.  Lemko was damaged by its reliance upon the representations made by Stroud, Fiorey and MAN as Lemko procured and transmitted to MAN the Equipment and Services and, more importantly, signed the NDA and provided MAN with its proprietary and confidential information and technology. The NDA also, purportedly, restricts Lemko from otherwise profiting from its efforts and business relationship with CWI. Finally, Lemko was prevented from realizing the benefits under the Contract and the expected profits from being able to install its technology in the Canadian mining and oil companies through its relationship with MAN as purported by MAN.

**WHEREFORE**, Plaintiff, Lemko Corporation, respectfully requests that this Honorable Court grant judgment in its favor and against MAN and award compensatory and punitive damages to be proven and grant such other and further relief as this Court deems just and reasonable under the circumstances.

## Count V

### Rescission for Fraud in the Inducement

32.  Plaintiff repeats and realleges and incorporates Paragraphs 1 through 16 and 27 through 31 as if fully set forth herein.

**WHEREFORE**, Plaintiff, Lemko Corporation, respectfully requests that this Honorable Court grant judgment in its favor and against MAN and award compensatory and punitive damages to be proven and grant such other and further relief as this Court deems just and reasonable under the circumstances.

**Plaintiff demands trial by jury on all issues so triable.**

           **LEMKO CORPORATION**

          By: s/John M. Riccione
            One of Its Attorneys

John M. Riccione
Nathan H. Lichtenstein
Jillian S. Cole
ARONBERG GOLDGEHN DAVIS & GARMISA
330 N. Wabash Ave. – Suite 1700
Chicago, Illinois  60611
312-828-9600
492403.v2

# MUTUAL AGREEMENT NOT TO USE OR DISCLOSE PROPRIETARY INFORMATION

THIS MUTUAL AGREEMENT NOT TO USE OR DISCLOSE PROPRIETARY INFORMATION ("Confidentiality Agreement") is made as of this 13th day of March, 2008, by and between LEMKO Corporation, with offices located at 1700 E. Golf Road, 7th Floor, Schaumburg, Illinois 60173 ("Recipient") and Metropolitan Area Networks, Inc., a Delaware corporation, with an office at 774 Mays Boulevard, Suite 10-465, Incline Village, NV 89451 ("MNET"). MNET and Recipient are individually referred to herein as a "Party" and collectively as the "Parties."

## Background

A. MNET agrees to provide certain Proprietary Information (defined below in paragraph 2) to Recipient for the purpose of evaluating a strategic alliance between MNET and Recipient. This Proprietary Information includes but is not limited to: information regarding roll out and operation of MNET's UltraBroadband™ networks, processing of certain Federal Communications Commission ("FCC") license applications, ownership and use of certain FCC spectrum, matters related to MNET's "white space" projects and information regarding MNET's business operations and strategic plans.

B. Recipient agrees to provide certain Proprietary Information to MNET for the purpose of evaluating a strategic alliance between MNET and Recipient. This Proprietary Information includes but is not limited to: financial statements, capital structure, technical information, customer/subscriber information, coverage area, services provided, employees, strategic and growth plans, spectrum holdings, licenses, certifications, contracts and other information as requested by MNET.

C. The Parties agree to hold in confidence all Proprietary Information exchanged between them and to use such Proprietary Information only for the purposes contemplated by this Confidentiality Agreement. All Proprietary Information is highly confidential and restricted from disclosure by the terms of this Confidentiality Agreement.

## Terms

NOW, THEREFORE, in consideration of the promises herein, the Parties agree as follows:

1. <u>Non-Use and Non-Disclosure Obligation</u>. For a period of three (3) years from the date any Proprietary Information (as defined herein) is received or otherwise obtained by the Parties through operation of this Confidentiality Agreement, the Parties hereby agrees that they shall not: (a) disclose such Proprietary Information to any other person, firm or entity; (b) reverse engineer, reverse compile or attempt to derive the composition or underlying information of any Proprietary Information; and (c) use such



Proprietary Information for any purpose other than solely to benefit a strategic alliance between MNET and Recipient.

2. <u>Definition of Proprietary Information</u>. Proprietary Information protected under this Confidentiality Agreement shall include, but not be limited to: all FCC license application forms; all knowledge, and all information pertaining to processing and submission of the FCC license application forms; all background information used for input into the FCC license application forms; all information regarding business operations including but not limited to roll out and operation of MNET's UltraBroadband™ networks, ownership and use of certain FCC spectrum and matters related to MNET's "white space" projects, all information, both commercial and technical regarding, data process technology, cell libraries, circuit designs, software designs, business contacts and know-how of that Party or of a third party which is in the possession of information belonging to that Party to this Confidentiality Agreement, whether in written, magnetic, electronic, visual, oral, audio or other form (collectively referred to herein as "Proprietary Information"). Documents provided to the Parties do not have to be marked as "Confidential" or "Proprietary" to be afforded protection under this Confidentiality Agreement. Information disclosed by one Party to another shall not be deemed Proprietary Information and the Party receiving the information shall not be liable for disclosure of any information if the same was: (i) at the time of disclosure already in the possession of the receiving Party, without restriction; (ii) in the public domain at the time it was disclosed or at a later date becomes a part of the public domain through no fault of the receiving Party; (iii) disclosed to receiving Party by a third party without restriction or (iv) independently developed by the receiving Party without breach of this Confidentiality Agreement.

3. <u>Restrictions on Copying; Obligations to Protect</u>. All documents provided by each Party to the other, including but not limited to UltraBroadband™ documents, "white space" documents and other documents shall be maintained by the receiving Party in a secure area. In addition to the other obligations of this Confidentiality Agreement, the receiving Party shall use that same standard of care with respect to protecting Proprietary Information that it accords its own proprietary information and confidential information, but in no event shall such standard of care be less than a reasonable standard of care.

4. <u>Property of Disclosing Party; No License</u>. All Proprietary Information including copies and excerpts of such Proprietary Information shall be and remain the property of the Party disclosing such Proprietary Information. Nothing contained in this Confidentiality Agreement shall be construed as granting to the receiving Party any license or right to use any intellectual or industrial property rights of the Party disclosing the Proprietary Information.

5. <u>Required Disclosure</u>. In the event that the Party receiving any Proprietary Information becomes legally compelled to disclose any of the Proprietary Information of the Party making the disclosure, the receiving Party shall provide the Party making the

disclosure with prompt notice thereof, prior to any disclosure of Proprietary Information so that the Party making the disclosure may contest such requirement or seek a protective order or other appropriate remedy. The receiving Party shall use its reasonable best efforts to assist the Party making disclosure in such efforts. In the event that disclosure is required, the receiving Party shall furnish only that portion of the Proprietary Information which is legally required.

6. **Return of Proprietary Information.** Upon written request of the Party making disclosure, the receiving Party shall promptly return to the Party making the disclosure all Proprietary Information and documents received or otherwise obtained from the Party making disclosure and all copies and excerpts of the same. Upon written request of the Party making the disclosure, the receiving Party shall also permanently destroy all electronic and digital versions of the Proprietary Information and the documents.

7. **Injunctive Relief.** The Parties recognize that the damages which would be incurred by a violation of any provisions of this Confidentiality Agreement may be of such a nature as not to be susceptible to calculation, and that monetary damages may therefore be an inadequate remedy and that equitable and injunctive relief, in addition to monetary damages, would be an appropriate remedy. Each Party further agrees to waive any right to require the other Party to obtain a bond in connection with any action brought by the other Party to enforce its rights hereunder.

8. **Export Controls.** In addition to the other restrictions of this Confidentiality Agreement, the Parties shall not export any Proprietary Information in violation of U.S. export control laws. Accordingly, but without limiting the obligations of the prior sentence, the Parties shall not export or transmit any Proprietary Information or any direct product thereof, directly or indirectly, to the People's Republic of China, Afghanistan, or to any of Groups Q (Romania), S (Libya), W (Czechoslovakia and Poland), Y (Albania, Bulgaria, Cambodia, Estonia, Laos, Latvia, Lithuania, Mongolian People's Republic, and the geographic area formerly known as the USSR) or Z (Cuba, North Korea and Vietnam) countries specific in Supplement No. 1, Section 770 of the Export Administration Regulations (as such country Groups may be updated or revised from time to time) without prior written consent, if required, of the U.S. Department of Commerce or any other governmental entity as may have jurisdiction over such export or transmission.

9. **Non-Circumvention.** Upon the Parties' execution of this Confidentiality Agreement, MNET intends to disclose to Recipient certain Proprietary Information including but not limited to information regarding MNET's UltraBroadband™ networks, processing of certain FCC license applications, ownership and use of certain FCC spectrum, matters related to "white space" projects, technology, trade secrets, business transactions, principal parties, associates, financial sources and/or agents for possible participation in business transactions and/or joint ventures by and between the Parties, now and in the future. Recipient hereby agrees to maintain complete confidentiality regarding the Proprietary Information described herein and disclosed to Recipient, and

will not directly or indirectly attempt to contact, solicit, deal with or profit from said introductions without prior written consent from MNET.

10. <u>Miscellaneous</u>.

10.1 <u>Superseding Agreement</u>. This Confidentiality Agreement supersedes any similar confidentiality and/or non-disclosure agreement(s) between the Parties.

10.2 <u>Governing Law and Jurisdiction</u>. This Confidentiality Agreement shall be governed by and construed in accordance with the laws of the State of Nevada. For purposes of any legal action arising out of or in connection with this Confidentiality Agreement, the Parties hereby submit to the non-exclusive jurisdiction of the federal and state courts in the State of Nevada.

10.3 <u>Attorney's Fees and Costs</u>. In any legal action arising out of or in connection with this Confidentiality Agreement, the losing Party shall pay the prevailing Party reasonable attorney's fees and other costs and expenses which may be incurred by the prevailing Party in such action.

10.4 <u>Successors and Assigns</u>. This Confidentiality Agreement shall be binding upon the Parties and shall inure to their benefit and the benefit of their permitted successors and assigns.

10.5 <u>Headings and Captions</u>. The headings and captions used in this Confidentiality Agreement are inserted for convenience only and shall not affect the construction or interpretation of the respective provisions of this Confidentiality Agreement.

10.6 <u>No Modifications</u>. No modifications, changes or waivers of this Confidentiality Agreement shall be valid unless made in writing and signed by both Parties.

10.7 <u>No Waiver</u>. The failure or delay of a Party to exercise its rights hereunder or any custom or practice of a Party in variance with the terms hereof shall not constitute a waiver by the relevant Party of the terms of this Confidentiality Agreement and the rights granted to the relevant Party herein are to the right of the relevant Party to demand exact compliance with the terms hereof. Waiver by a Party of any particular default by the other Party shall not constitute a waiver of any subsequent default of the same or different nature.

10.8 <u>Partial Invalidity</u>. If any provision of this Confidentiality Agreement shall be declared void, voidable, illegal or unenforceable by any court of competent jurisdiction, administrative body or arbitration panel, such declaration or finding shall not void or cancel the other provisions of this Confidentiality Agreement which shall remain binding upon the Parties. Any provision of this Confidentiality Agreement if found invalid, illegal or unenforceable shall be renegotiated by the Parties to accomplish so far as possible the business purpose of this Confidentiality Agreement.

10.9 <u>Counterparts</u>. This Confidentiality Agreement may be signed in counterparts, including separate signature pages, which when taken together, shall constitute one and the same instrument.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, hereby have caused this Confidentiality Agreement to be duly executed as of the date first written above, as evidenced by their signatures below.

_____
Signature of Recipient

Agreed and Accepted By:
METROPOLITAN AREA NETWORKS, INC.

Signature: _____
Name:
Title:



**Lemko Corporation**
1700 E Golf Rd., 7th Floor
Schaumburg, IL  60173

# Invoice

| Date | Invoice # |
|---|---|
| 6/25/2008 | 3-2161 |

| Bill To |
|---|
| Metro Area Networks<br>6130 - 3rd Street SE<br>Calgary, AB, Canada T2H 1K4 |

| Ship To |
|---|
| Metro Area Networks<br>6130 - 3rd Street SE<br>Calgary, AB, Canada T2H 1K4<br>Bill Chastain C/O Jonathan Kinghorn |

| P.O. Number | Terms |
|---|---|
| PA 041108 | Due on receipt |

| QTY | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | System Sale | dMARC complete with GSM BTS (2 TRX,) Server, MySQL License, E1/T1 Line Card, dMARC Software for 2 TRX | 38,800.00 | 38,800.00 |
| 1 | System Sale | dMAG complete with Server, SS7 for ISUP and MAP | 46,700.00 | 46,700.00 |
| 1 | System Sale | Installation services for 1 dMARC and 1 dMAG (5 days) | 13,500.00 | 13,500.00 |
| 1 | Customer Order De... | Payment made On May 16, 2008 | -23,500.00 | -23,500.00 |

It's been a pleasure working with you!

| | |
|---|---|
| **Total** | $75,500.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $75,500.00 |

EXHIBIT 2